## TEXAS & P. RY. CO. v. MENGEL CO.
### No. 560.

District Court, E. D. Louisiana,
New Orleans Division.

Oct. 17, 1945.

Phelps, Dunbar, Marks & Claverie, of New Orleans, La., for plaintiff.

Curtis, Hall & Foster, of New Orleans, La., and Charles G. Middleton, of Louisville, Ky., for defendant.

BORAH, District Judge.

Declaring upon a written contract of lease dated November 26, 1929, The Texas & Pacific Railway Company brought this action against the Mengel Company to recover rent in the sum of $42,822.58 for the period August 15, 1941, through March 10, 1945. The Mengel Company has answered and as a defense alleges that it canceled the lease on August 31, 1941, as it had a right to do, and that it paid all rent due up to and including August 15, 1941, and thereafter tendered plaintiff the sum of $548.39 to cover rent from August 15, 1941, to August 31, 1941, which tender plaintiff refused. The issues are thus confined within narrow limits.

The case was tried by the court without a jury on stipulations of fact and the testimony of witnesses introduced by the plaintiff.

The material facts are these:

On March 11, 1920, the receivers of the Texas & Pacific Railway Company leased to the J. S. Otis Mahogany Company, Inc., certain property in the City of New Orleans described as follows: "That parcel of ground in the sixth municipal district of the City of New Orleans, bounded by Tchoupitoulas Street; Henry Clay Avenue; the Mississippi River and Audubon Park, excepting only the Railroad right of way of the Public Belt and Illinois Central Railroads, and including such rights to the batture or accessions in front of the property and extending to the Mississippi River as the lessor may have."

This lease was for a term of ten years at $4,000 per annum, and among its provisions contained an option in favor of the lessee for renewal for fifteen years at $12,000 per annum. The lease contained a cancellation privilege reading as follows: "(8) The lessee reserves the right to cancel the lease at any time during its existence by giving the lessor twelve months' notice in writing of the lessee's intention so to do. This provision and right to cancel applies only in the event of interference by the

Federal, State, or Municipal Governments, or any Board or political sub-division thereof, with the free and full use of the property by the lessee hereunder."

On August 19, 1922, this lease was, with the consent of the plaintiff's receivers, assigned by the Otis Company to the defendant. The defendant entered into possession of the premises and remained in continuous possession thereof until shortly prior to August 31, 1941, at which time it removed from the premises and thereafter exercised none of the rights of a lessee thereof. The defendant's business, like Otis Company's, was that of a manufacturer of mahogany lumber, logs being unloaded from ships in the Mississippi River on which the leased premises front and being then transported across the batture to the defendant's plant, where the logs were converted into lumber. The railroad tracks of the New Orleans Public Belt Railroad and of the Illinois Central Railroad separate the defendant's plant from the batture.

On March 13, 1924, the defendant entered into a contract with the Public Belt Railroad Commission of the City of New Orleans whereby the latter permitted the former to build and operate a crossing, with the trackage of the Public Belt in front of the defendant's plant. It was mutually understood and agreed that the crossing was to be constructed at defendant's expense, in accordance with the requirements of the Public Belt and that any expense for the maintenance or the renewal of the crossing was to be borne by the defendant. In this contract the Public Belt reserved the right to cancel the agreement on ninety days' notice in the event that a change or extension of existing facilities of the Belt Railroad should make necessary, in its judgment, the elimination of the authorized grade crossing.

Shortly after the date of this contract the defendant constructed the tramway. The tracks ran from the defendant's plant site across the railway tracks and the levee and down into the waters of the river. The method of operation was as follows: A car was used and operated on the tramway with a cable attached as a means of transporting the mahogany logs from the Mississippi River across the batture and across the tracks of the New Orleans Public Belt Railroad and the Illinois Central Railroad to the defendant's plant. The car was run down the tramway into the river, the logs floated onto the car and the car was pulled to the crown of the levee by means of a cable and ran the rest of the distance to the mill by force of gravity.

On November 26, 1929, after an exchange of correspondence in relation to certain changes and additions to the terms of the existing lease, the plaintiff and the defendant entered into a lease of the afore-described property for fifteen years beginning March 11, 1930, at a rental of $12,000 per annum payable monthly in advance. This lease provided that the premises were to "be used only as a site for conducting the present business of the lessee". This quoted phrase appears in the earlier lease save for the word "present".

Section 7 of the new lease, like section 8 of the lease of 1920, gave the lessee the right to cancel under certain conditions. The language wherein the new section 7 differed from the old section 8 is indicated below by italics: "(7) The Lessee reserves the right to cancel the lease at any time during its existence by giving to the Lessor twelve months notice in writing of the Lessee's intention so to do. This provision and right to cancel applies only in the event of interference by the Federal, State or Municipal Governments, or any Board or political subdivision thereof, *or by forces of nature,* with the free and full use of the property *including the use of the river and its banks* by the Lessee hereunder."

At the time of the execution of the foregoing lease the defendant was actually operating the tramway across the tracks of the Public Belt, which fact was known to the plaintiff.

On July 25, 1940, the Public Belt Railroad Commission gave Mengel Company notice of cancellation, pursuant to Article 5 of the agreement of March 13, 1924, which notice read as follows: "Under date of March 13, 1924, the Public Belt Railroad Commission for the City of New Orleans and your company entered into a written agreement whereby the right and privilege was granted by the Public Belt Railroad Commission for you to construct over the railroad tracks of the Belt a tramway track from in front of your plant to the Levee of the Mississippi River. At the request of your Mr. Vernon Davis this tram crossing was removed on June 3, 1940. As it is the intention of the Public Belt Railroad Commission to completely cancel the agreement between it and your company dated March 13, 1924, this letter is written to you in compliance with the fifth article

of said agreement, as written notice of the cancellation of this agreement."

In response to this notice the defendant wrote the Public Belt on August 15, 1940, pointing out that the cancellation of the contract would seriously hinder and interfere with its utilization of the plant site during the remainder of the term of its lease, and requesting that the Public Belt reconsider and withdraw the notification quoted above. Under date of August 27, 1940, the Public Belt replied to the defendant's request in a letter reading in part as follows:

" * * * Your request that cancellation of contract of March 13, 1924 be postponed until the expiration of your lease, is noted.

"I assume, however, that you are not in possession of all of the facts in the case. When this contract was executed the main lines of the Public Belt Railroad that were crossed by your tram track were relatively unimportant. Since that time, however, the Mississippi River Bridge has been built and is used by the Southern Pacific RR. for the movement of its freight traffic to and from New Orleans. We are about to enter into a contract with the Texas & Pacific RR. whereby its passenger and freight business will enter and leave New Orleans via the Mississippi River Bridge. All of this traffic must pass over the main tracks crossed by your tram.

"Prior to the beginning by the TP–MP Railroad use of the bridge, it will be necessary to interlock the entire line for the protection of passenger service, consequently a heavy expense will be entailed by the Mengel Company (approximately $15,000.00) for interlocking the tram track crossings, unless the contract is cancelled.

    *     *     *     *     *     *

"I think therefore, that I was fully justified in the notice of cancellation contained in my letter of July 25th."

Under date of August 29, 1940, the defendant addressed a letter to the plaintiff as follows:

"You are familiar with our tramway track which crosses the track of New Orleans Public Belt Railroad in front of the property at Exposition Boulevard and Tchoupitoulas Street, New Orleans, Louisiana which we lease from you under an agreement dated November 26, 1929.

"New Orleans Public Belt Railroad Commission has given us notice of cancellation of the agreement under which this tram-way track was constructed, operated and maintained. We understand that our agreement with the Public Belt Railroad Commission is being cancelled because Texas and Pacific Railway Company is going to operate freight and passenger trains over Public Belt tracks which are crossed by our tramway track.

"The cancellation by the New Orleans Public Belt Railroad Commission of our right to maintain, use and operate this tramway track is an interference with the free and full use of the property, including the use of the Mississippi River and its banks, leased by us from you under the agreement of November 26, 1929 within the meaning of Section 7 thereof.

"The Mengel Company hereby avails itself of the privilege of cancellation provided for in Section 7 of the said agreement dated November 26, 1929 and pursuant to said section hereby gives you twelve months notice of its intention and desire to cancel said lease, said notice to be effective August 31, 1940 and said lease to terminate, be cancelled and be of no further force and effect after August 31, 1941."

On September 6, 1940, plaintiff, through its president, replied as follows:

"I acknowledge receipt of your letter of August 29, 1940, addressed to The Texas and Pacific Railway Company, in which you undertake to give twelve months' notice of your intention and desire to cancel the lease agreement of November 26, 1929, covering certain property in New Orleans. You state that the cancellation by the New Orleans Public Belt Railroad Commission of your right to maintain, use and operate a certain tramway track is an interference with your free and full use of the leased property within the meaning of Section 7 of the agreement of November 26, 1929.

"I do not agree with your position, and therefore, cannot accept your letter of August 29th as effective notice of your intention to cancel your lease agreement with The Texas and Pacific Railway Company."

The Mengel Company paid all rent due in accordance with the terms of the lease up to and including August 14, 1941, and on August 12, 1941, forwarded its check for $548.39 to the plaintiff to cover rent from August 15, 1941, to and including August 31, 1941, which according to the letter of transmittal was in full, complete and final settlement of the Mengel Company's entire obligation under the lease agreement. The

check for $548.39 was promptly returned. In the letter of transmittal plaintiff reiterated its contention that the defendant's letter of August 29, 1940, was not an effective notice of defendant's intention to cancel the lease agreement and demanded a check for $1,000 covering rental for the period August 15, 1941, to September 15, 1941, in accordance with the lease contract. This demand was refused by the defendant in a letter dated August 19, 1941.

From the date the defendant took over the Otis Company lease by assignment dated August 19, 1922, to the date, shortly after March 13, 1924, when the tramway was built across the Public Belt and the Illinois Central Railroad tracks, the defendant, as the Otis Company had done, drayed the mahogany logs which had been unloaded from ships in the river across the batture to the defendant's plant, where such logs were manufactured into lumber. The defendant company has drayed no logs since 1924.

The defendant removed all of its property and effects from the leased premises prior to August 31, 1941, having previously notified the plaintiff, in its letter of August 12, 1941, above quoted, that it would do so, and the defendant has not since occupied the premises or exercised any rights of the lessee thereof.

At no time during the period beginning with its lease of said property to the Otis Company and through March 10, 1945, did plaintiff exercise any rights of ownership over the leased premises.

On June 3, 1940, the tramway crossings over the tracks of the Public Belt were removed by the Public Belt. The tramway crossings over the tracks of the Illinois Central Railroad Company were removed in January, 1940, but the agreement under which the defendant crossed the Illinois Central tracks with its tramway remained in effect. The tramway crossings over both the Illinois Central tracks and over the Public Belt tracks were several times removed and then replaced.

The defendant received its last shipment of mahogany logs on October 24, 1939.

By stipulations, there have been annexed to the record a number of documents, including letters and telegrams dealing with efforts by the defendant to purchase the leased property, with negotiations in 1929 looking to the renewal of the lease and with efforts made by the defendant between the years 1933 and 1940 to obtain either a reduction of the rental or a cancellation of the lease.

There is also testimony regarding the cost of interlocking or overpassing the tramway crossing, of signaling, derailing and the like. There is also testimony regarding the question of whether or not there was an unequivocal cancellation of the Public Belt crossing permit referred to above. In the court's view of this case, as will be explained hereafter, none of this material is of sufficient importance to warrant its being summarized in this opinion.

■ The rights of the parties are measured by the terms of the lease of November 26, 1929, and the court must ascertain its true meaning. When, as here, the language is clear and explicit the court must ascertain the intent of the parties from the language used. The whole of the instrument must be read together and the whole of it must be looked at to determine the effect of each part.

The present controversy turns on the effect which should be given to the particular language in section 7, supra, of the aforementioned lease. It will be remembered that section 7 contains an express recognition of lessee's right to cancel the lease "in the event of interference by the Federal, State, or Municipal Governments, or any Board or political subdivision thereof, or by forces of nature, with the free and full use of the property including the use of the river and its banks by the Lessee hereunder". The words "including the use of the river and its banks" are not to be found in corresponding section 8 of the lease of 1920 and it must be assumed that they were added to the later lease for a purpose. That purpose is not hard to find.

At the time of the execution of the lease of November 26, 1929, and indeed for five years prior thereto, defendant had an agreement with the Public Belt under the terms of which it acquired the right to operate a tram track crossing over the Belt tracks. This crossing was a vital part of defendant's operation and plaintiff knew of it when it made its lease to defendant in November, 1929. The right to use the Public Belt tracks was necessarily in the minds of both parties, because without it, defendant's lease would have been of little or no value. If we assume, as we must, that the lease of November, 1929, was made with reference to the state of things existing at the time it was made, it is quite easy to

understand that any prudent business man would want to safeguard himself from loss occasioned by the withdrawal of such a permit by providing for the cancellation of the lease in the event that such withdrawal occurred.

■ One of the four stipulations forming part of the pre-trial order sets forth the correspondence which passed between the parties prior to the signing of the new lease of November 26, 1929. This stipulation was received in evidence subject to the objection of defendant's counsel, which was in substance that all matters of negotiation antecedent to and dehors the writing were merged in the instrument and should be excluded. For the reason which counsel gave, and because the contract of lease is plain and requires no reference to extraneous matters to determine its meaning, the court now concludes that this correspondence should have been excluded.

But assuming that plaintiff is right and that the meaning of the contract is not clear and that a reference to the surrounding circumstances should be allowed for an explanation of the terms used, it does not follow that plaintiff's position will be improved. Plaintiff would have the court hold that the added words of section 7 were designed merely to provide for the contingency "that perhaps at some future time it would no longer be feasible, economically, to control the depth of the water through dredging operations, and further that, there might be danger that the United States Engineers would not permit the Mengel Company going further out into the river". Unquestionably, the action "by forces of nature" was one of the possibilities that the parties had in mind, and the section so recites. But it was not the only possibility, else why does the lease clearly specify that the envisaged interference was that of the federal, state or *municipal* governments? Had interference only by the United States Engineers been feared by the lessee, the inclusion of municipal government would have been purposeless. And the words "or any Board thereof" precisely classify the New Orleans Public Belt Railroad Commission, for it is a board of a municipal government.

It is seemingly clear that the Public Belt did unequivocally cancel defendant's permit to use the crossing without any alternative whatsoever. But conceding for the sake of argument that the defendant was given the alternative of having its permit canceled or of spending $15,000 for interlocking the crossing, it by no means follows that plaintiff's position is strengthened. "Interference" by the Public Belt was not restricted to cancellation of the permit, and it could be accomplished with equal effectiveness by laying down expensive conditions to the continuance of the permit.

■ Where, as here, the absolute right of cancellation exists under certain conditions, the party enjoying that right, as does the defendant in this case, cannot be required to expend money in order to avoid the necessity of cancellation when those conditions are present. Indeed, it would be a contradiction in terms to grant an *absolute* right under certain conditions and then, when those conditions arose, to compel the party possessing that right to pay toll in order to avoid the necessity of exercising it.

■ It is argued on behalf of plaintiff that the cancellation of defendant's right to cross the Public Belt tracks was not an interference with the free and full use of the property leased; that whatever interference this brought about had to do not with the use of the leased premises but with the use of the Public Belt tracks. I cannot agree. The lease in clear and unequivocal language provides that defendant has a right to cancel in the event of interference "with the free and full use of the property including the use of the river and its banks by the Lessee hereunder". The interference referred to is not, as plaintiff contends, an interference with the leased property, but is an interference with *the free and full use* of the leased property *including the use of the river and its banks*. This language does not require an actual interference with or encroachment on the property itself. It is the use of the property that was important and the use of the property without the right to cross the Public Belt tracks was of little value. When, therefore, the right to cross was taken away from defendant it was left with a piece of property upon which it could not practicably, if at all, conduct its present business. Nor could it by the terms of the lease employ the property in any other way. This action on the part of the Public Belt canceling the grade crossing permit was a direct interference with the defendant's right to the full and free use of the property including the use of the river and its banks, and defendant therefore was within its reserved right in canceling its lease.

As will appear from the pleadings and the pre-trial order plaintiff's suit is predicated on the sole ground that the defendant did not in compliance with its alleged obligations pay the rentals due under the contract for the period beginning August 15, 1941, through March 10, 1945, when the lease expired. Having held that the defendant in the exercise of its legal right did cancel the lease on August 31, 1941, and as the court is not concerned with defendant's motive, there now remains for decision the final question as to whether the defendant did in compliance with law make a real tender of $548.39 which it admitted it owed to the plaintiff.

The stipulated facts in this case show that the plaintiff did not refuse the tender because of the manner in which it was made, but because of the amount that was being offered on the theory that the lessee had the right to cancel the lease. A formal tender would have been a vain and useless thing and the Louisiana law does not require it. Louisiana Highway Commission v. Bullis, 197 La. 14, 18, 200 So. 805.

In the light of this decision and the views herein expressed it follows that plaintiff is entitled to recover the amount tendered and no more. The Clerk is accordingly directed to enter judgment in favor of plaintiff and against defendant in the amount of $548.39 without interest, and with costs in defendant's favor.